**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DIONISIOS KAROUNOS,

              Plaintiff,

          - against -

THE CITY OF NEW YORK; POLICE OFFICER
JOHN DOES 1-5, each in their individual and
official capacities (true names unknown); 100
LAFAYETTE STREET LTD.; THE LAND AND
BUILDING KNOWN AS 94-100 LAFAYETTE
STREET a/k/a 91-93 WALKER STREET, TAX
BLOCK 195, TAX LOT 17, COUNTY OF NEW
YORK, CITY and STATE OF NEW YORK; 100
LAFAYETTE, LLC; "JOHN OWNER" and "JANE
OWNER," fictitiously named parties, true names
unknown, the parties intended being the owners,
lessees, operators, or occupants of the commercial
establishment doing business as SANTOS PARTY
HOUSE located at 96 Lafayette Street, New York,
New York; and any person claiming any right, title,
or interest in the real property which is the subject
of this action; SPH BOUNCERS 1-4, true names
unknown, the parties intended being the employees
of SANTOS PARTY HOUSE that assaulted and
battered Plaintiff on March 23, 2013 and then
falsely accused him of having committed a crime.

              Defendants.

Civil Action No. 14-CV-1686 (NRB)

**FIRST AMENDED COMPLAINT**

Jury Trial Demanded

## NATURE OF THE ACTION

1.    This is a civil action seeking damages against a nightclub called Santos Party

House and its owners and employees. The damages stem from an incident in which employees of

said nightclub, while working as bouncers, assaulted and battered Plaintiff on a public sidewalk

in front of Santos Party House without provocation or cause and then falsely informed police

officers of the New York Police Department that Plaintiff had assaulted them. Those police

1

officers then further violated Plaintiff's rights by intentionally pushing him down a flight of stairs at the police precinct.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

3.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

5.      Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that, *inter alia*, the events giving rise to the claim occurred in the Southern District of New York.

6.      Joinder of Plaintiff's claims against these various defendants is proper pursuant to Federal Rule of Civil Procedure 20(a)(2) in that the claims stem from the same transaction or occurrence or series of transactions and occurrences, and by virtue of the fact that the claims against the defendants involve common questions of law and fact.

## SUPPLEMENTAL JURISDICTION

7.      This Court has supplemental jurisdiction over Plaintiff's state claims herein under the Constitution and Laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

## JURY TRIAL DEMANDED

8.      Plaintiff demands a trial by jury on each and every one of the claims pled herein.

## PARTIES

9.     Plaintiff DIONISIOS KAROUNOS is and was at all relevant times a resident of Bronx County in the State of New York.

10.     SANTOS PARTY HOUSE ("SPH") is a nightclub located at 96 Lafayette Street in the County of New York in the State of New York.

11.     The Defendant LAND AND BUILDING KNOWN AS 94-100 LAFAYETTE STREET, A/K/A 91-93 WALKER STREET, TAX BLOCK 195, TAX LOT 17, NEW YORK, NEW YORK, is the real property location of SPH.

12.     The Defendant 100 LAFAYETTE LTD. is a domestic business corporation doing business as Santos Party House ("SPH"). It is the licensee and operator of SPH.

13.     The Defendant 100 LAFAYETTE LLC is the last recorded owner of the real property where SPH is located, according to a deed recorded in New York County, Office of the City Register on June 15, 1999.

14.     Defendant CITY OF NEW YORK ("CITY") is a municipal corporation duly organized and existing by virtue of the laws of the State of New York, and the New York Police Department is one of its agencies.

15.     Defendants SPH BOUNCERS 1-4 are employees of SPH that were working as bouncers on the night of the incident in question.

16.     Police Officer Defendants JOHN DOES 1-5 were at all relevant times police officers of the New York Police Department and agents of CITY.

17.     The true names of JOHN DOES 1-5 are not currently known to Plaintiff. However, all of said Defendants are employees or agents of the NYPD. Accordingly, said Defendants are entitled to representation in this action by the New York City Law Department

("Law Department") upon their request, pursuant to New York General Obligations Law § 50-k. The Law Department, then is hereby put on notice (a) that Plaintiff intends to name said officers as Defendants in an amended pleading once the true names of said Defendants become known to Plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

18.    In addition to the facts alleged in the following paragraphs, Defendant JOHN DOES 1-5 are sued in their individual and official capacities and all acted within the scope of their employment and under color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or Defendant CITY.

19.    The true names of the owners of Santos Party House – herein designated as "JOHN OWNER" and "JANE OWNER" – are not currently known to Plaintiff.  Santos Party House then is hereby put on notice (a) that Plaintiff intends to name said owners (whether they be a corporation or individuals or both) as Defendants in an amended pleading once the true names of said Defendants become known to Plaintiff and (b) that the owners of SPH should immediately begin preparing their defense in this action.

20.    The true names of Defendants SPH BOUNCERS 1-4 are not currently known to Plaintiff, though they are all employees of SPH and it is suspected that one employee is named Fernando Rodriguez.[1]

21.    Joinder of Plaintiff's claims against all of these Defendants is proper pursuant to Federal Rule of Civil Procedure 20(a)(2) in that Plaintiff's claims against the Defendants arise out of the same occurrence, described herein, and the claims contain numerous common questions of law and fact.

---

[1] The criminal court complaint filed against Plaintiff stemming from this incident contains allegations from a person named Fernando Rodriguez.

4

## THE BEATING OF DIONISIOS KAROUNOS

22.     On the evening of March 23, 2013, at approximately 8:30 p.m., Plaintiff went alone to Santos Party House, a nightclub and multilevel musical performance venue located at 96 Lafayette Street.  Plaintiff waited in line on the sidewalk in front of 96 Lafayette Street but was denied admission to SPH because he did not have enough cash to pay the cover charge.  After a brief disagreement with the SPH staff at the door to the nightclub, Plaintiff voluntarily decided to leave and left to go somewhere else.  Nevertheless, multiple employees of SPH – the SPH BOUNCERS 1-4 - pursued him and unjustifiably and needlessly pummeled Plaintiff with their fists and kicked him with their feet on the sidewalk in front of 96 Lafayette Street.

23.     As a result of this group assault, Plaintiff suffered serious physical injuries including but not limited to blackened and bloodied eyes, contusions, lacerations, and significant pain all over his body.

24.     Police Officer Defendants JOHN DOES 1-5 (police officers from the Fifth Precinct of the New York Police Department) appeared on the scene as Plaintiff was being beaten.  Plaintiff – in the process of being pummeled by a group of SPH employees and already suffering numerous obvious injuries to his face and body – immediately demanded that his attackers be arrested for assaulting him.  Nevertheless, despite the clear evidence that Plaintiff was the victim of a gang assault by SPH employees, the police officers arrested Plaintiff and caused his liberty to be restricted by placing his injured arms in handcuffs.

25.     Defendants SPH BOUNCERS 1-4 then communicated to the Defendant Police Officers JOHN DOES 1-5 that Plaintiff had assaulted them, and did so knowing that said information was false and untrue and with the intent that Plaintiff be arrested and prosecuted for a crime that he did not commit.

26.     At no point after he was handcuffed did Plaintiff make any attempt to escape from the police officers or use physical force against any other police officers.  At no point prior to his apprehension did Plaintiff attempt to ever use physical force against any other police officer or any other person.

27.     Plaintiff was then transported by said JOHN DOES 1-5 to the Fifth Precinct (in New York County) in a police vehicle against his will.

28.     At the Fifth Precinct, Plaintiff, while handcuffed, was deliberately pushed down a flight of stairs by two police officer defendants (two officers from the group previously designated as JOHN DOES 1-5, herein designated as the "ASSAULTING OFFICERS").  Plaintiff suffered additional injuries to his arms and body, including but not limited to pain and bruising, as a result of falling down the stairs while handcuffed.

29.     Other police officers, including Defendant JOHN DOES 1-5, utterly failed to hold their fellow officers accountable for their actions in seriously injuring Plaintiff, by failing to question the ASSAULTING OFFICERS about the true nature of the pushing of Plaintiff down the stairs, by failing to notify the Internal Affairs Bureau ("IAB"), or by assuming command of the rest of the arrest process.

30.     Other police officers at the Fifth Precinct observed Plaintiff's injuries, including Defendants JOHN DOES 1-5, and utterly failed to hold their fellow officers accountable for their actions in seriously injuring Plaintiff, by failing to question the ASSAULTING OFFICERS about the true nature of the pushing of Plaintiff, by failing to notify the Internal Affairs Bureau, or by assuming command of the rest of the arrest process.

31.     At the Fifth Precinct, Plaintiff requested an ambulance, and was transported by ambulance from the Fifth Precinct police station to the emergency room at Bellevue Hospital,

while continually in the custody of JOHN DOES 1-5.

32.    At Bellevue Hospital, medical professionals confirmed that Plaintiff had suffered severe bruising about his face, arms, legs and body. Plaintiff was given basic treatment for his injuries and then transported from Bellevue Hospital to Central Booking in downtown Manhattan.

33.    In furtherance of their scheme to justify their completely unlawful arrest and unwarranted use of force, the Police Officer Defendant JOHN DOES 1-5 arrested Plaintiff and falsely charged him with misdemeanor assault.

34.    The employees of SPH, Defendants SPH BOUNCERS 1-4, were bouncers tasked with maintaining security at SPH on the date and time of the assault. Though their actions in assaulting Plaintiff were illegal, they were performed while they were working at SPH and were within the scope of their duties as employees of SPH.

35.    The Defendants 100 LAFAYETTE LTD, 100 LAFAYETTE LLC, and JOHN OWNER and JANE OWNER (collectively "SPH MANAGERS") were previously made aware of instances of their employees exercising unjustified physical violence upon people at SPH.

36.    At all relevant times, the SPH MANAGERS were responsible for the hiring, training, retention, and supervision of the employees at SPH, including but not limited to Defendants SPH BOUNCERS 1-4.

37.    SPH BOUNCERS 1-4 were responsible for maintaining security at SPH and were authorized and instructed by the SPH MANAGERS to use physical force as part of their employment duties. As such, the unwarranted and excessive beating of Plaintiff by SPH BOUNCERS 1-4 was within the scope of their job responsibilities and reasonably foreseeable by the SPH MANAGERS.

7

38.    The SPH MANAGERS had further reason to foresee the possibility of violent and unjustified behavior by their employees (such as SPH BOUNCERS 1-4) at SPH in light of a determination by the New York State Liquor Authority, dated August 31, 2011, which concluded after a hearing that there was substantial evidence that a security guard working at SPH had assaulted two club patrons at SPH. Said factual determination was later upheld as being supported by substantial evidence by the Appellate Division, First Department, in a written decision dated March 12, 2013, or shortly prior to the assault and beating of Plaintiff at SPH. *See In re 100 Lafayette Street, Ltd. d/b/a Santos Party House v. New York State Liquor Authority*, 2013 NY Slip Op. 01507 (1st Dept. March 12, 2013).

## THE CRIMINAL PROCEEDINGS AGAINST PLAINTIFF

39.    Next, the Defendants conspired to shield themselves from liability, embarrassment, and charges of misconduct by wrongfully and falsely convincing the New York County District Attorney's Office that there was at least reasonable cause to believe that Plaintiff was guilty of a misdemeanor assault against one of the SPH employees that had beaten Plaintiff.

40.    To that end, on March 24, 2013, a police officer from the Fifth Precinct of the New York Police Department attested to a misdemeanor complaint filed in New York County Criminal Court ("Complaint") charging Plaintiff with one count each of Assault in the Third Degree (Penal Law Section 120.00[1]), Assault in the Third Degree (Penal Law Section 120.00[2]), Attempted Assault in the Third Degree (Penal Law Sections 110/120.00[1]), and Harassment in the Second Degree (Penal Law Section 240.26), under the theory that Plaintiff had assaulted another individual in front of 96 Lafayette Street.

41.    On June 28, 2013, the New York County District Attorney's Office dismissed the criminal charges against Plaintiff in Part C of New York County Criminal Court. Accordingly, Plaintiff was not convicted of any criminal offense whatsoever in connection with this incident.

### PLAINTIFF'S INJURIES SUSTAINED AS A RESULT OF THE BEATING

42.    As a result of the aforementioned police beating, Plaintiff has suffered numerous physical injuries, emotional and psychological damage, and loss of wages.

43.    Said physical injuries, include, *inter alia*, severe pain and distress, bleeding, severe bruising about his arms, legs, face and body, psychological and emotional damage, recurring nightmares, anxiety and horror.

### CLAIMS FOR RELIEF

### COUNT I

### (42 U.S.C. § 1983 – Police Brutality as against JOHN DOES 1-5 and CITY)

44.    Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

45.    The Defendant JOHN DOES 1-5, specifically the ASSAULTING OFFICERS, acting under the color of state law and within the scope of their authority, assaulted and battered the Plaintiff in violation of the civil rights of the Plaintiff, more particularly, 42 U.S.C. § 1983 as well as other applicable federal and state laws, including the Fourth and Fourteenth Amendments to the United States Constitution.

46.    The deprivation of Plaintiff's civil rights was a result of the Defendant Police Officers Richard Roes 1-10 acting under color of state law and within their authority as law enforcement officers within the employ of the Defendant CITY and the NYPD.

47.    The Defendants, including but not limited to the Defendant Police Officers JOHN

DOES 1-5 were not acting with immunity when they deprived the Plaintiff of his civil rights by pushing him down a flight of stairs at the Fifth Precinct of the NYPD.

48.     At no time during the events described above or as the events occurred did the Defendant officers have cause or justification to push or injure Plaintiff.

49.     At no time, either at the time and place of the police assault or at any later time and place, did Plaintiff attempt to offer violence to any of the Defendant officers.

50.     The aforementioned assault was done knowingly, intentionally and willfully.

51.     The aforementioned assault was done negligently and recklessly.

52.     The aforementioned assault was done without reason or provocation.

53.     By reason of said pushing of Plaintiff down the stairs, Plaintiff was caused to suffer severe physical injuries, including pain and suffering, emotional and psychological distress and horror.

### COUNT II

### (42 U.S.C. § 1983 – Monell claim as against CITY)

54.     Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

55.     All of the acts and omissions by Police Officer Defendants JOHN DOES 1-5 described above were carried out pursuant to overlapping policies and practices of the Defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant.CITY, and its agency the NYPD.

56.     Defendant CITY and the NYPD, by their other policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police Defendants' wrongful

acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

57.     The acts complained of were carried out by JOHN DOES 1-5 in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the Defendant CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

58.     The aforementioned customs, practices, procedures and rules of the Defendant CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.  Fabricating evidence in order to justify (or attempt to justify) otherwise suspicion-less arrests;

b.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

c.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

d.  Retaliating against officers who report police misconduct; and

e.  Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

59.     The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the Defendant CITY:

a.  *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of

summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

   b.  *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

   c.  *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the Defendant CITY's motion to dismiss on *Iqbal/Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

   d.  *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, *to wit*, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[2]

   e.  *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest Plaintiff during a "vertical patrol" of a public housing project

---

[2] For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, ·N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/ 19critical.html?_r=1.

despite evidence that he had a legitimate reason to be on the premises);

    f. *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

    g. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

    h. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

    i. *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

    j. *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

    k. *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

    l. *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

    m. *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS

8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

    n. *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

    o. *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

    p. *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD BEATING death of Amadou Diallo);

    q. *White-Ruiz v. The City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

    r. *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in

response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department); and

     s.  *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her).

60.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, *inter alia*, by the following:

    .a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[3]

    b.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

---

[3] Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in

*Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread

[...] custom or policy by the city approving illegal conduct" such as lying under oath and

false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for

personal gain. It's more for convenience."[4]

d.  Defendant CITY's tacit condoning of and failure to supervise, discipline or

provide remedial training when officers engage in excessive force is evidenced by its

systematic disregard of the recommendations of the Civilian Complaint Review Board

("CCRB").  CCRB is a Defendant CITY agency, allegedly independent of the NYPD that

is responsible for investigating and issuing findings on complaints of police abuse and

misconduct.[5]  When it does, however, Police Commissioner Ray Kelly controls whether

the NYPD pursues the matter and he alone has the authority to impose discipline on the

subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom

the CCRB found to have engaged in misconduct received punishment more severe than

verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD

has simply dropped (i.e., closed without action or discipline) has spiked from less than

4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008.

Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB

---

[4] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[5] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

in 2009.[6] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[7]

    e.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month and for pushing officers to falsify official documents. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[8]

61.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, *inter alia*, by the following:

---

[6] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[7] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[8] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[9]
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[10]

b.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[11] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

---

[9] Mollen Commission Report, p. 36.

[10] Mollen Commission Report, pp. 40-41.

[11] Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.
>
> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[12]

    c.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of criminal charges in connection with those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[13]

    d.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. John] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover

---

[12] *Id.*

[13] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[14]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[15]

    e.  In early 2010, the Defendant CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[16] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the Defendant CITY in the case, admitted: "Officer Spencer falsely reported to the assistant District Attorney that he saw [the Plaintiff] beckon to three male passersby and that he was aware that Plaintiff was previously arrested for [prostitution] when the Plaintiff had never been arrested for this offense." According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[17]

    f.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug

---

[14] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, available at http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[15] John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[16] In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://articles.nydailynews.com/2010-01-08/local/17943916_1_prostitution-charges-arrested

[17] *Id.*

dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[18]

62.    The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct, are further evidenced, *inter alia*, by the following:

a.    Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.    In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.    Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

63.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the Defendant CITY.

---

[18] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

64.     The aforementioned actions of JOHN DOES 1-5 resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the Defendant CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

65.     All of the foregoing acts by Defendants deprived Plaintiff of federally protected rights, including, but limited to, the right:

     a.  Freedom from unreasonable searches and seizures of his person;

     b.  Freedom from arrest without probable cause;

     c.  Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Plaintiff was aware and did not consent;

     d.  Freedom from deprivation of liberty without due process of law; and

     e.  The enjoyment of equal protection, privileges and immunities under the laws.

66. Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

67. Defendant CITY is directly liable and responsible for the acts of JOHN DOES 1-5 because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the Defendant CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

68. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and Defendant CITY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

69. The aforementioned Defendant CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned Defendant CITY policies, practices and/or customs, JOHN DOES 1-5 felt empowered to exercise unreasonable and wholly unprovoked force against Plaintiff, arrest Plaintiff without probable cause. Pursuant to the aforementioned Defendant CITY policies, practices and/or

customs, JOHN DOES 1-5 failed to intervene in or report other Defendants' violation of Plaintiff's rights.

70.     Plaintiff's injuries were a direct and proximate result of the Defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

71.     The actions of JOHN DOES 1-5 resulted from and were taken pursuant to the foregoing *de facto* policies and/or well-settled and widespread customs and practices of the Defendant CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

72.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the Plaintiff's constitutional rights.

73.     As a direct and proximate cause of the acts of all Defendants as set forth above, Plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT III

### (42 U.S.C. §§ 1983, 1986 – Failure to Intervene as against JOHN DOES 1-5)

74.     Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

24

75.     Each of the JOHN DOES 1-5 had knowledge of the conspiracy to arrest, harm, and wrongfully deprived Plaintiff of his constitutional and statutory rights as set forth above, in that they were physically present near Plaintiff at the time that he was unjustifiably arrested and pushed down the stairs at the police precinct.

76.     Each of the JOHN DOES 1-5, through the exercise of reasonable diligence, had the power to prevent or aid in preventing such deprivation.

77.     Each of the Defendants neglected or refused to prevent such deprivation.

78.     As a direct and proximate cause of the acts of each of the JOHN DOES 1-5 as set forth above, Plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT IV

### (42 U.S.C. §§ 1985 – Conspiracy to Interfere with Civil Rights as against JOHN DOES 1-5)

79.     Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

80.     Each of the JOHN DOES 1-5 conspired for the purpose of depriving Plaintiff the equal protection of the laws.

81.     Each of the JOHN DOES 1-5 took an act in furtherance of the object of said conspiracy.

82.     As a direct and proximate cause of the acts of all JOHN DOES 1-5 as set forth above, Plaintiff suffered physical injury, loss of income, medical expenses, and severe mental anguish in connection with the deprivation of this constitutional and statutory rights guaranteed

by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT V

### (False Arrest and False Imprisonment as against JOHN DOES 1-5)

83.    Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

84.    JOHN DOES 1-5 further deprived Plaintiff of his civil rights by falsely arresting him and causing him to be physically restrained, handcuffed, and imprisoned against his will without having probable cause to make an arrest.

85.    JOHN DOES 1-5, the officers that arrested Plaintiff, were physically present while Plaintiff was being beaten and bloodied by John Does 1-4 (employees of defendant Santos Party House). A reasonable police officer under the circumstances could not have possibly concluded that Plaintiff was the perpetrator of an assault, and not the victim of one. Put another way, those police officers could not have possibly concluded that SPH BOUNCERS 1-4 were defending themselves from an assault by Plaintiff, as Plaintiff was already seriously injured and was being punched and stomped on the street by multiple individuals when JOHN DOES 1-5 arrived and first observed Plaintiff. JOHN DOES 1-5 were not entitled to rely upon any communications from SPH BOUNCERS 1-4 because their assertions that Plaintiff assaulted them were plainly unreasonable.

86.    As a direct and proximate cause of the acts of JOHN DOES 1-5 as set forth above, Plaintiff suffered a loss of liberty, mental anguish and emotional and psychological injury, loss of income, in connection with the deprivation of this constitutional and statutory

rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## COUNT VI

### (Assault and Battery as against SPH BOUNCERS 1-4 and SPH MANAGERS)

87.    Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

88.    By the actions described above, the Defendants SPH BOUNCERS 1-4 did inflict assault and battery upon Plaintiff. The acts and conduct of these Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

89.    As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

90.    Defendants SPH MANAGERS are jointly and severally liable for the assault and battery of Plaintiff via the doctrine of respondeat superior.

91.    Defendants SPH BOUNCERS 1-4 and SPH MANAGERS are jointly and severally liable to Plaintiff inasmuch as this claim arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT VII

### (Negligent Hiring and Retention as against SPH MANAGERS)

92.    Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

93.    The SPH MANAGERS were negligent and failed to exercise a reasonable duty of

27

care in the hiring, training and retention of SPH BOUNCERS 1-4, so as to cause serious physical injury to Plaintiff.

94.     Such negligence consisted of negligence in training, hiring, supervision and retention of SPH BOUNCERS 1-4; in failing to observe the existing SPH protocols for employees designed to govern the use of physical force causing the serious injuries both physical and emotional resulting out of the aforementioned wrongful beating of the Plaintiff and further; failing to properly investigate their background; failing to properly train and instruct JOHN DOES 1-4, especially regarding the abuse of physical force while working at SPH; failing to give JOHN DOES 1-4 proper instructions on the use of force; improperly supervising JOHN DOES 1-4 during the course of their employment at SPH, which resulted in the serious physical injuries Plaintiff sustained.

95.     The SPH MANAGERS, through their agents, servants, employees, including but not limited to SPH BOUNCERS 1-4 were negligent, reckless and careless in beating the Plaintiff.

96.     The SPH MANAGERS had prior knowledge of the inappropriate, unlawful, and improper conduct of SPH BOUNCERS 1-4, and continued to employ them and allowed them to be in contact with the public at large.

97.     For this claim under New York State Law, Defendants JOHN DOES 1-4 and SPH MANAGERS are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

28

## COUNT VIII

### (Intentional Infliction of Emotional Distress against SPH BOUNCERS 1-4 and SPH MANAGERS)

98.   Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

99.   The intentional acts complained of by Plaintiff and committed by the SPH BOUNCERS 1-4 amount to extreme and outrageous conduct that cannot be tolerated in a civilized community.

100.   The intentional acts complained of by Plaintiff and committed by SPH BOUNCERS 1-4 were plainly likely to cause extreme emotional distress to Plaintiff.

101.   As a result of the foregoing acts by SPH BOUNCERS 1-4, the Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

102.   The SPH MANAGERS had prior knowledge of the inappropriate, unlawful, and improper conduct of SPH BOUNCERS 1-4, and continued to employ them and allowed them to be in contact with the public at large.

103.   The SPH MANAGERS are jointly and severally liable for the intentional infliction of emotional distress upon Plaintiff via the doctrine of respondeat superior.

104.   For all claims under New York State Law, Defendants SPH BOUNCERS 1-4 and the SPH MANAGERS are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT IX

### (Prima Facie Tort as against SPH BOUNCERS 1-4 and SPH MANAGERS)

105.   Plaintiff repeats and re-alleges each and every allegation set forth in all preceding paragraphs with the same force and effect as if more fully set forth at length herein.

106.   SPH BOUNCERS 1-4, intentionally caused physical and emotional injury to Plaintiff and had no excuse or justification for their actions.

107.   As a result of the foregoing, the Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

108.   The SPH MANAGERS are jointly and severally liable for this prima facie tort against Plaintiff via the doctrine of respondeat superior.

## COUNT X

### (Malicious Prosecution as against SPH BOUNCERS 1-4 and SPH MANAGERS)

109.   Shortly after they beat Plaintiff, SPH BOUNCERS 1-4 intentionally and maliciously informed JOHN DOES 1-5 that Plaintiff had assaulted them.

110.   SPH BOUNCERS 1-4 communicated this knowing falsehood with the intent that Plaintiff would be arrested and thereby deprived of his liberty as a result.

111.   As a result of said falsehood, Plaintiff was in fact arrested and incarcerated and thereby deprived of his liberty against his will.

112.   SPH BOUNCERS 1-4 communicated this falsehood within the scope of their job responsibilities so as to shield their employers, the SPH MANAGERS, from civil liability for the assault and battery they had just perpetrated upon Plaintiff.

113.    As a result of said knowing falsehood communicated by SPH BOUNCERS 1-4, prosecutors initiated a criminal case in New York City Criminal Court against Plaintiff. Said criminal case was eventually terminated in Plaintiff's favor with a full dismissal of all charges against him.

114.    The SPH MANAGERS are jointly and severally liable for the malicious prosecution of Plaintiff via the doctrine of respondeat superior.

115.    For this claim under New York State Law, Defendants are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT XI

### (False Arrest/False Imprisonment as against SPH BOUNCERS 1-4 and SPH MANAGERS)

116.    Shortly after they beat Plaintiff, SPH BOUNCERS 1-4 intentionally and maliciously informed JOHN DOES 1-5 that Plaintiff had assaulted them.

117.    SPH BOUNCERS 1-4 communicated this knowing falsehood with the intent that Plaintiff would be arrested and thereby deprived of his liberty as a result.

118.    As a result of said falsehood, Plaintiff was in fact arrested and incarcerated and thereby deprived of his liberty against his will.

119.    SPH BOUNCERS 1-4 communicated this falsehood within the scope of their job responsibilities so as to shield their employers, the SPH MANAGERS, from civil liability for the assault and battery they had just perpetrated upon Plaintiff.

120.    As a result of said knowing falsehood communicated by SPH BOUNCERS 1-4, prosecutors initiated a criminal case in New York City Criminal Court against Plaintiff. Said

criminal case was eventually terminated in Plaintiff's favor with a full dismissal of all charges against him.

121.    The SPH MANAGERS are jointly and severally liable for the false arrest and false imprisonment of Plaintiff via the doctrine of respondeat superior.

122.    For this claims under New York State Law, Defendants SPH BOUNCERS and SPH MANAGERS are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.

## COUNT XII

## (Defamation as against SPH BOUNCERS 1-4 and SPH MANAGERS)

123.    Shortly after they beat Plaintiff, SPH BOUNCERS 1-4 intentionally and maliciously informed JOHN DOES 1-5 that Plaintiff had assaulted them.

124.    SPH BOUNCERS 1-4 communicated this knowing falsehood with the intent that Plaintiff would be arrested and thereby deprived of his liberty as a result.

125.    As a result of said falsehood, Plaintiff was in fact arrested and incarcerated and thereby deprived of his liberty, and further suffered reputational damage.

126.    SPH BOUNCERS 1-4 communicated this falsehood within the scope of their job responsibilities so as to shield their employers, the SPH MANAGERS, from civil liability for the assault and battery they had just perpetrated upon Plaintiff.

127.    As a result of said knowing falsehood communicated by SPH BOUNCERS 1-4, prosecutors initiated a criminal case in New York City Criminal Court against Plaintiff. Said criminal case was eventually terminated in Plaintiff's favor with a full dismissal of all charges against him.

32

128.   The SPH MANAGERS are jointly and severally liable for the malicious prosecution of Plaintiff via the doctrine of respondeat superior.

129.   For this claims under New York State Law, Defendants are jointly and severally liable to Plaintiff inasmuch as this action arises out of the exceptions set forth in 1602 subdivisions 5, 7 and 11 of the Civil Practice Law and Rules.


**WHEREFORE**, Plaintiff DIONISIOS KAROUNOS respectfully requests judgment upon all causes of action against Defendants as follows:

1.   With respect to the Defendant CITY and its subsidiary agency the NYPD:

a. Declaratory judgment declaring that Defendant CITY and NYPD has violated the aforesaid statutes and constitutions.

b. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for the Defendants unlawful, wrongful, tortuous, and unconstitutional conduct;

c.   Compensatory damages in an amount to be determined by the court and jury;

d.   Punitive damages in the amount to be determined by the court and jury;

e. Reasonable attorney's fees, disbursements and costs of this action, pursuant to 42 U.S.C. § 1988;

f.   All legal and statutory interest on sums awarded; and

g. Such other and further relief as this honorable court may deem just, proper and equitable.

2.   With respect to each of the POLICE OFFICER JOHN DOES 1-5

a. Declaratory judgment declaring that the Defendants have violated the aforesaid

statues and constitutions;

b. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous, and unconstitutional conduct;

c. Compensatory damages in an amount to be determined by the court and jury;

d. Punitive damages in an amount to be determined by the court and jury;

e. Reasonable attorney's fees, disbursements, and costs of this action, pursuant to 42 42 U.S.C. § 1988;

f. All legal and statutory interest on sums awarded; and

g. Such other and further relief as this honorable court may deem just, proper and equitable.

3.   With respect to defendant 100 LAFAYETTE STREET LTD.,

a. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous conduct;

b. Compensatory damages in the amount of not less than $250,000.

c. Punitive damages in an amount to be determined by the court and jury;

d. All legal and statutory interest on sums awarded; and

e. Such other and further relief as this honorable court may deem just, proper and equitable.

4.   With respect to defendant THE LAND AND BUILDING KNOWN AS 94-100 LAFAYETTE STREET a/k/a 91-93 WALKER STREET, TAX BLOCK 195, TAX LOT 17, COUNTY OF NEW YORK, CITY and STATE OF NEW YORK.,

    a. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous conduct;

    b. Compensatory damages in the amount of not less than $250,000.

    c. Punitive damages in an amount to be determined by the court and jury;

    d. All legal and statutory interest on sums awarded; and

    e. Such other and further relief as this honorable court may deem just, proper and equitable.

5.    With respect to defendant 100 LAFAYETTE, LLC,

    a. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous conduct;

    b. Compensatory damages in the amount of not less than $250,000.

    c. Punitive damages in an amount to be determined by the court and jury;

    d. All legal and statutory interest on sums awarded; and

    e. Such other and further relief as this honorable court may deem just, proper and equitable.

6.    With respect to defendants JOHN OWNER AND JANE OWNER,

    a. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous conduct;

    b. Compensatory damages in the amount of not less than $250,000.

    ·c. Punitive damages in an amount to be determined by the court and jury;

d. All legal and statutory interest on sums awarded; and

e. Such other and further relief as this honorable court may deem just, proper and equitable.

7.     With respect to each of the SPH BOUNCERS 1-4,

a. Restitution to Plaintiff of his rights, privileges, benefits and income which would have been received by him but for each Defendant's unlawful, wrongful, tortuous conduct;

b. Compensatory damages in the amount of not less than $250,000;

c. Punitive damages in an amount to be determined by the court and jury;

d. All legal and statutory interest on sums awarded; and

e. Such other and further relief as this honorable court may deem just, proper and equitable.


Dated: New York, New York          GALLUZZO & JOHNSON LLP
       July 14, 2014
                                   By: _____
                                      Matthew J. Galluzzo
                                      matthew.galluzzo@gjllp.com
                                      *Attorneys for Plaintiff DIONISIOS KAROUNOS*
                                      48 Wall Street, 11th Floor
                                      New York, New York 10005
                                      Tel: (212) 918-4661
                                      Fax: (646) 402-6429